557 So.2d 455 (1990)
STATE of Louisiana
v.
Angel Tomas Baro PEDROSO a/k/a Angel Baro.
No. 89-KA-671.
Court of Appeal of Louisiana, Fifth Circuit.
February 14, 1990.
*456 John M. Mamoulides, Dist. Atty., W.J. LeBlanc, and Dorothy A. Pendergast, Asst. Dist. Attys., 24th Judicial District, Parish of Jefferson, Gretna, for plaintiff/appellee.
Bruce G. Whittaker, Indigent Defender Bd., Gretna, for defendant/appellant.
Before GRISBAUM, DUFRESNE and WICKER, JJ.
WICKER, Judge.
Angel Tomas Baro Pedroso, a/k/a Angel Baro (Baro), defendant/appellant, was charged by grand jury indictment with the second degree murder of his wife, Beverly Baro, in violation of L.S.A.-R.S. 14.30.1. He was tried by a twelve person jury, found guilty as charged, and sentenced to the mandatory term of life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. Baro was given credit for time served.
Baro filed a Motion for Appeal, alleging two assignments of error. We affirm his conviction and sentence.
The evidence adduced at trial showed that on the evening of May 11, 1986, Baro and his wife who had been drinking together all day, went to a local bar with some friends. While at the bar, an argument ensued between Baro and his wife because she was dancing in an intimate fashion with another man. The couple then left the bar and returned home, still arguing. In the heat of the argument, Baro's wife became very angry and said: "Angel, Angel, I do with my body as I wish. If I wish to go to bed with anybody it's because I wish to, because your penis does not become erect anymore." Enraged by her statement, Baro fatally stabbed his wife multiple times with a kitchen knife. Baro immediately left the trailer and fled to Miami where he was arrested three months later.
In his first assigned error, Baro alleges that the trial court erred in permitting the state to repeatedly ask hypothetical questions to prospective jurors in such a way as to solicit their opinion and prejudgment on facts which were to be proved at trial.
During the voir dire questioning, the prosecutor, Mr. LeBlanc, read to the jury panel the definition of second degree murder, the offense with which Baro was charged, and manslaughter, a lesser included responsive verdict. After reading the definition of manslaughter, Mr. LeBlanc stated:
Now, things that you would have to look at in going through the statute let's make sure everybody understands the offense would have to be committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive the average person of self control and cool reflection, and then provocation shall not reduce homicide to manslaughter if the jury finds the offender's blood actually cooled or the average person's blood would have actually cooled. So, let's go through a few examples and see if we can apply it.
* * * * * *
I want to go back to manslaughter and read it again and give you a factual situation and ask how you think this applies. It says: Manslaughter is a homicide which would be murder, either second degree murder or first degree murder, but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection. Provocation *457 shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled or that the average person's blood would have cooled at the time the offense was committed.
Over defense objection, Mr. LeBlanc then proceeded to ask the following questions to the prospective jurors:
Let's have a barroom situation, and a fellow is sitting at the bar, and he's having a couple of beers with his friends, and there's this bully at the end of the bar that's real drunk, real obnoxious, keeps directing comments to this guy. And, finally, he goes over, and he just pushes him and pushes him, and pushes him, and the guy just turns around, and he had a pocketknife on him, and he just stabs him, and it went right through the heart. That's what he wanted to do, and the guy died. Mr. Jennfreau, what do you think about that? Is that heat of passion?
MR. JENNFREAU:
I would say so.
* * * * * *
Let's take the factual situation a little bit further. Let's say at the same time of the incident, he pushes and pushes, and this time the guy just leaves and says, man, later, and he leaves the barroom, and an hour later he sees the guy, and goes over and stabs him. What do you think? Heat of passion?
MR. JENNFREAU:
No. I think he would have had time to cool off.
MR. LeBLANC:
Does anybody have any comment or feel any differently about this?
(Prospective jurors answer in a negative response.)
MR. LeBLANC:
See, I'm not going to tell you what the law is. I think you can see that each case is decided upon the particular facts and so, you know, like if as in our example, that might have been enough. If there was two minutes, you might not feel it was.
I want to read to youthis is your first exposure to this, so indulge me if I seem to be reading the thing over and over again. I'm just trying to indoctrinate you so you all become familiar with it.
It says manslaughter is a homicide which would be murder under either first degree murder or second degree murder, but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection.
Mr. Jennfreau, let's say that we have an obnoxious drunk who goes over to this fellow here and just tells the fellow, man, you're some kind of wimp, you're just the biggest wimp I've ever seen, I can't believe you. You and your friend are just a bunch of wimps. At that point the fellow at the bar turns around and stabs him right through the heart and kills him. Is the provocation sufficient to deprive an average person of self control?
MR. SIERRA:
I'm going to object. May we approach the bench?
(Bench conference between Court and Counsel.)
MR. LeBLANC:
Mr. Jennfreau, do you remember that example? Do you think that namecalling as we talked about, for example, would that be provocation sufficient enough to deprive an average person of self control?
MR. JENNFREAU:
No, I don't think so.
MR. LeBLANC:
How about you?
MR. GLASS:
No.
MRS. THIBODAUX:
No, it shouldn't.
MR. LeBLANC:
Mr. McDaniel, how about you?
MR. McDANIEL:
It's a provocation, but I don't think enough to react to that kind of stabbing event.
MR. LeBLANC:
*458 You don't think so?
MR. NISKOCH:
No.
MRS. PIERCE:
No, I don't think it's sufficient provocation.
MRS. WEBRE:
I agree.
MR. LeBLANC:
Anybody disagree?
(Prospective jurors answer in a negative response.)
MR. LeBLANC:
It would be okay if you did. I don't mean to suggest in any way that these are ironclad rules here. You may feel like under a very similar set of circumstances that is right.
MR. PATHAK:
I couldn't understand provocation.
MR. LeBLANC:
That's a factual determination that the jury has to decide, whether or notwhatever the act was, whether that was sufficient provocation to cause someone to do what he did.
MR. PATHAK:
That's what I thought, but I wanted to clarify it.
MR. LeBLANC:
As you can see, some things go into itit's purely factual things. It would be impossible to just draw a black line and say look, if you fall on this side it's murder or if you fall on that side it's manslaughter. That's purely a jury question. I'm just trying to go intoas you can see, there are several different elements that make up what is manslaughter and determines manslaughter from a murder. I'm just trying to make sure that we have a basic understanding of the principles so that you can apply the facts as we hear them and the testimony to it. Does anybody have any questions about that?
(Prospective jurors answer in a negative response.)
Mr. LeBlanc proceeded to ask these hypothetical questions to each panel of prospective jurors. The question which this Court must now answer is whether the hypothetical questions posed by the prosecutor were prejudicial insofar as they solicited the jurors' opinion and allowed prejudgment on facts which were to be proved at trial. We believe the trial judge did not abuse his discretion in permitting this line of questioning by the prosecutor.
"The court, the state, and the defendant shall have the right to examine prospective jurors. The scope of the examination shall be within the discretion of the court." L.S. A.C.Cr.P. art. 786.
The purpose of voir dire examination is to determine the qualifications of prospective jurors by testing their competency and impartiality and discovering bases for the intelligent exercise of causal and peremptory challenges. Parties must be afforded wide latitude in the conduction of voir dire. The rulings of the trial judge regarding the scope of voir dire examination will not be disturbed absent a clear showing of abuse of discretion. State v. Straughter, 406 So.2d 221 (La.1981); State v. Clark, 325 So.2d 802 (La.1976).
Although parties are given wide latitude during the course of voir dire, it has been held that hypothetical questions aimed at determining in advance a juror's opinion concerning the weight of certain evidence are improper. Voir dire may not be used to pry into prospective juror's opinions concerning evidence to be offered at trial. In State v. Gabriel, 542 So.2d 528 (La.App. 5th Cir.1989), this Court cited with approval State v. Young, 480 So.2d 434 (La.App. 4th Cir.1985), which held:
It is highly improper to ask a potential juror if he would act in a particular way under certain circumstances because such a question seeks to commit him in advance as to his verdict. That type of question is related to the merits of the case rather than to the proper subject of voir direthe qualifications of the juror. [citations omitted].
We find that the trial judge did not abuse his discretion in allowing the state to ask the contested questions to the prospective jurors. The hypothetical questions *459 asked did not commit the jurors in advance to a verdict, nor did they solicit the prospective jurors' opinions regarding evidence to be offered at trial. The sole purpose behind the prosecutor's questioning was to determine whether the prospective jurors clearly understood the legal difference between murder and manslaughter.
Accordingly, this assignment lacks merit.
Also assigned as error are any and all errors patent on the face of the record.
L.S.A.C.Cr.P. art. 920 provides: "[t]he following matters and no others shall be considered on appeal: (1) An error designated in the assignments of error; and (2) An error that is discoverable by a mere inspection of the pleadings and proceedings and without inspection of the evidence."
A review of the record in this case reveals no errors patent. Accordingly, the conviction and sentence are affirmed.
AFFIRMED.